IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

JAMAR W. DAVIS, JR.,         )
        Plaintiff,       )
                    )     Civil Action No. 4:16-cv-27
v.                    )
                    )     REPORT AND RECOMMENDATION
COMMISSIONER OF      )
SOCIAL SECURITY,       )     By:    Joel C. Hoppe
        Defendant.     )    United States Magistrate Judge

Plaintiff Jamar Davis asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying his applications for child's insurance benefits ("CIB")

and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401–434, 1381–1383f. This Court has authority to decide Davis's case under 42

U.S.C. §§ 405(g) and 1383(c)(3), and his case is before me by referral under 28 U.S.C.

§ 636(b)(1)(B) ECF No. 12. After reviewing the administrative record, the parties' briefs, and the

applicable law, I find that the Commissioner's final decision is not supported by substantial

evidence in the record. This Court previously remanded Davis's case for further administrative

review. On remand, the Administrative Law Judge ("ALJ") properly and thoroughly analyzed

many of the issues raised in Davis's applications. Nonetheless, she committed reversible error in

excluding from Davis's residual functional capacity ("RFC") a restriction reflecting his

moderately limited ability to sustain an ordinary routine without additional supervision.

Therefore, I recommend that the District Court **GRANT** Davis's Motion for Summary

Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No.

17, **REVERSE** the Commissioner's final decision, and **REMAND** this case for further

proceedings under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work.[1] *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the Commissioner to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Davis filed for SSI on October 25, 2010, and for CIB on November 16, 2010, alleging disability beginning October 3, 2009. Administrative Record ("R.") 52, 60, ECF No. 9. Davis was nineteen years old on his alleged onset date and had never worked. R. 52, 200–07. He said that he could not work because of "achondroplasia, leg problems, sleep apnea, and asthma." R. 52. A state agency twice denied his applications in 2011. R. 59, 67, 81, 93. Davis appeared with counsel at an administrative hearing before ALJ Drew A. Swank on June 6, 2012. R. 12. Davis testified as to his symptoms and to the limiting effect of his conditions. R. 22–43. In a written decision dated June 27, 2012, ALJ Swank concluded that, based on his age, education, and ability to do "unskilled light work," Davis was not entitled to disability benefits. R. 19–20.

---

[1] CIB claims are analyzed using the same five-step sequential process. *Hicks v. Colvin*, No. 7:12-cv-618, 2014 WL 670916, at *2 n.2 (W.D. Va. Feb. 20, 2014); SSR 11-2p, 2011 WL 4055665, at *2–3 (Sept. 12, 2011). However, a dependant adult applicant for CIB also must show that his or her disability began before his or her 22nd birthday. *See* 20 C.F.R. § 404.350(a)(2), (5).

ALJ Swank found that Davis suffered from "severe" hypochondroplasia,[2] borderline intellectual functioning, sleep apnea, and asthma. R. 14. None of Davis's severe impairments or combination of impairments met or medically equaled one of the adult impairments listed in the Act's regulations. *See id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 1, pt. A §§ 3.10, 12.05). ALJ Swank next determined that Davis had the RFC to do "simple and unskilled" light work that involved only occasional climbing, crawling, and kneeling and avoided "concentrated exposure to fumes and odors." R. 16. At step four, ALJ Swank found that Davis had never worked and therefore could not return to a past job or occupation. R. 19. At step five, ALJ Swank used grid Rule 202.20 as a "framework" for finding Davis "not disabled" because Davis's "additional limitations [had] little or no effect on the occupational base of unskilled light work." *Id.* The Appeals Council declined to review ALJ Swank's decision, R. 1, and Davis appealed.

Upon review by this Court, the undersigned Magistrate Judge recommended that the Commissioner's final decision be reversed and remanded for further administrative proceedings. Report and Recommendation, *Davis v. Colvin*, No. 4:13cv35 (W.D. Va. July 14, 2014), ECF No. 19. I found that ALJ Swank properly assessed the medical and opinion evidence relating to Davis's physical functional capacity, *id.* at 12–14, but I determined that his assessment of Davis's mental functional capacity was not supported by substantial evidence, *id.* at 20–23. Specifically, ALJ Swank gave great weight to medical opinions finding moderate limitations in Davis's ability to maintain concentration, persistence, or pace; sustain an ordinary routine without special supervision; or complete a normal workday or workweek without interruptions

---

[2] Hypochondroplasia is a type of dwarfism characterized by short stature, a long trunk and short limbs, broad and short fingers, and a normal-appearing face. *Dorland's Illustrated Medical Dictionary* 913 (31st ed. 2007). Individuals with hypochondroplasia exhibit "milder clinical features" than individuals with achondroplasia. *Id.* The latter condition is characterized by "dwarfism with short limbs, normal trunk, small face, normal vault, lordosis, and trident hand[s]." *Id.* at 15.

from psychologically based symptoms. Nonetheless, he did not include these limitations in the RFC or explain why he omitted them. Instead, ALJ Swank limited Davis to performing "simple unskilled work," which I determined did not adequately account for the above mental limitations. I also found that ALJ Swank erred in relying on the Grids, rather than calling a vocational expert ("VE") to testify about Davis's ability to perform work, because Davis had nonexertional impairments that could affect the occupational base. *Id.* at 23–25. The presiding District Judge adopted the Report and Recommendation and remanded the case for further administrative proceedings. Order, *Davis v. Colvin*, No. 4:13cv35 (W.D. Va. Aug. 7, 2014), ECF No. 20.

On remand, the Appeals Council vacated ALJ Swank's decision and remanded Davis's case to another ALJ. R. 470. On July 15, 2015, Davis appeared before ALJ H. Munday for an administrative hearing. R. 378–412. Davis testified, as did a VE. On August 12, 2015, ALJ Munday issued a written opinion denying Davis's applications for disability benefits. R. 476–95. She found that Davis had not attained the age of twenty-two as of the alleged onset date of disability of October 3, 2009. R. 479. Davis had worked from July to November 2014 unloading trucks, R. 554, but ALJ Munday found this was an unsuccessful work attempt. R. 479. Thus, she determined that he had not engaged in substantial gainful employment since his alleged onset of disability. *Id.* ALJ Munday found that Davis had severe impairments of achondroplasia and borderline intellectual functioning, but neither impairment met or equaled a listing. R. 479–84. As to Davis's RFC, ALJ Munday determined that he could perform light work;[3] frequently balance, stoop, kneel, crouch, and climb ramps and stairs; occasionally crawl; and never climb ladders, ropes, or scaffolds. R. 484. He could have frequent exposure to pulmonary irritants, and

---

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

he could perform simple, routine tasks involving simple work-related decisions, few workplace changes, and no work at a fixed production rate pace. *Id.* After determining that Davis did not have any past relevant work, ALJ Munday found that he could perform other jobs in the national economy, such as night cleaner, laundry sorter, and cashier. R. 494. Accordingly, she determined that Davis was not disabled under the Act. R. 495. The Appeals Council declined to exercise "jurisdiction" over Davis's request for review, explaining that Davis's exceptions did not provide a reason to change the ALJ's decision. R. 359–62. Davis appealed to this Court.

## III. Discussion

On appeal, Davis challenges two findings concerning his RFC. Pl.'s Br. 4, ECF No. 16. He contends that ALJ Munday's RFC determination and corresponding hypothetical to the VE were inadequate because they did not account for his moderate limitation in the ability to sustain an ordinary routine without special instructions or additional supervision or his moderate difficulty in completing a normal workday or workweek without interruption from psychological symptoms. In reviewing these objections, I note that other than Davis's testimony at the second administrative hearing, the record contains no evidence that bears significance on his mental functioning that was not before the Court in Davis's prior appeal.

A.      *Relevant Education and Medical Evidence*[4]

For most of his academic career, Davis received special-education services in a regular public school "under the label of Specific Learning Disability." R. 289, 292. Psychoeducational tests conducted in 1998 revealed "average to high average cognitive skills" in verbal reasoning, abstract and visual reasoning, quantitative reasoning, and short-term memory. R. 290. Davis scored "within the average range for his age" on reading, spelling, and arithmetic tests. *Id.* Those

---

[4] Much of the Court's discussion of the evidence is taken verbatim from the previous Report and Recommendation.

results were considered "inconsistent" with testing conducted in 1995, "which indicated [Davis's] cognitive ability to be within the low average range for his age." *Id.*

Davis was reevaluated for special-education services before going to middle school in 2001. R. 289. At that time, Davis's Full Scale IQ was 73, and his "cognitive scores consistently fell within the borderline range" for his age. R. 292, 294. Davis showed relative weakness in verbal reasoning and processing speed, where his "performance [fell] within the low average range for his age." *Id.* Dr. Reneé Sexton, Ed.S., the school psychologist who reevaluated Davis, recommended that special-education services continue in middle school. R. 293. She encouraged "mainstreaming" Davis with the caveat that he "would require a great deal of accommodations in the regular education program in order . . . to be successful." *Id.*

The record contains an Individualized Education Program ("IEP") from April of Davis's junior year that covered his senior year (2007–2008) at Halifax County High School. R. 252–84. Davis's IEP team concluded that he did not "demonstrate[] significant cognitive disabilities" and did not "require[] intensive, frequent, and individualized instruction" that might have justified a more "restrictive" learning environment. R. 275; *see also* R. 268–69. Rather, they stated that Davis's "needs are mild enough that resource services are appropriate with direct instruction and/or consultative services within the regular classroom," specifically ninety minutes of special education services in the classroom each day from his case manager. R. 268–69. He could receive a regular public-school education with some special-education services and specific accommodations for a processing disorder that affected his reading comprehension, memory, and timed output. R. 259, 266.

During the 2007–08 school year, for example, Davis received copies of his teachers' daily notes, had extra time to finish in-class written assignments, received shortened assignments

"as deemed necessary," was graded on a separate curve, and could ask teachers to read tests aloud. R. 259, 266. His teachers were asked to "question[ Davis] for comprehension" whenever they presented new material. R. 266. Davis could also keep a set of textbooks at home, and his teachers were generally required to check in with his mother every two weeks. *Id.*

The 2007 IEP team expressed concern that Davis had "become forgetful in fulfilling his academic responsibility," had "not utilized" his accommodations to their "fullest extent," and had not "worked to his full potential" in the past. R. 259. Davis's classroom teachers observed that he was "too relaxed" in class and "extremely slow, almost to the point of being negligent[,] in completing assignments." *Id.* Davis's final IEP, however, notes that he "made wise use of his time" in 2007–08. R. 254. He needed "continuous encouragement and reminder of his goals," but "[w]ith a reminder, [Davis] normally [got] back on track and progress[ed]" toward his goals. R. 253.

According to his high-school transcript, Davis took at least four courses each semester and never missed more than five classes per year. R. 251. Davis earned mostly B's and C's in core subjects like English, math, history, and science. *Id.* Davis did not have to repeat any grades, but he did retake one English course in summer school. *Id.* Davis graduated on May 30, 2008, with a Modified Standard Diploma, which is granted to students who are "unlikely to meet the credit requirements for a Standard Diploma." R. 251–52.

On August 16, 2011, Chris Cousins, Ph.D., evaluated Davis at the request of the agency by interviewing him and administering the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"). R. 341. Dr. Cousins observed that Davis greeted him warmly and appropriately, answered his questions clearly and spontaneously, and was engaged and cooperative during their interview. R. 341. Davis also exhibited "good" eye contact, "was very pleasant[,] and had a

friendly demeanor" throughout. *Id.* Davis said he intended to start college in the fall, but he had not enrolled in classes. R. 342.

Davis's performance on the WAIS-IV—demonstrating a Full Scale IQ of 72—"place[d] his intellectual functioning in the borderline range." R. 345–46. Davis "showed relative strength," albeit still in the "low average range," in the Perceptual Reasoning Index, "which assesses an individual's ability to analyze and synthesize abstract visual stimuli." R. 345. Davis showed relative weakness in the Working Memory Index, Verbal Comprehension Index, and Processing Speed Index. *Id.* Dr. Cousins explained that Davis appeared to have "good" abstract-thinking ability, "fair to good" capacity for immediate and remote memory, "fair to good" judgment and commonsense reasoning ability, "fair at best" calculation ability, and "poor" knowledge of commonly known facts and current events. R. 344.

Based on the interview and WAIS-IV results, Dr. Cousins opined that Davis "appear[ed] capable of performing simple and repetitive tasks," but that he "would not be able to perform detailed and complex tasks." R. 346. Dr. Cousins thought that Davis's "intellectual impairment" would cause "no worse than moderate difficulty" in "completing a normal workday or workweek without interruption and performing work activities on a consistent basis." *Id.* He also opined that, "due to his level of intellectual impairment," Davis "would require some special instructions or additional supervision." *Id.* Given Davis's "friendly" demeanor, Dr. Cousins opined that Davis "would be able to accept instructions from a supervisor and interact with coworkers and the public." However, he cautioned that Davis "may have some difficulty dealing with the usual stresses encountered in competitive work." *Id.*

On August 19, 2011, Dr. Leslie Montgomery, Ph.D., A.B.P.P., reviewed Davis's file for the state agency. R. 87, 90–91. Based on Davis's school records and Dr. Cousins's report, Dr.

Montgomery opined that Davis's "borderline intellectual functioning" was not presumptively disabling, R. 86, 87, but that it would cause many "moderate" limitations in the competitive workplace, R. 90–91. For example, Dr. Montgomery opined that Davis would be "moderately limited" in his ability to follow "very short and simple instructions"; to "maintain attention and concentration for extended periods"; to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; to "sustain an ordinary routine without special supervision"; to complete a normal work schedule without interruptions; and to "perform at a consistent pace" without unreasonable breaks. R. 90–91. She also opined that Davis would be "markedly limited" in his ability to follow "detailed" instructions and "would not be able to perform detailed and complex tasks." R. 90. Like Dr. Cousins, Dr. Montgomery attributed these work-related limitations to Davis's borderline intellectual functioning. *See* R. 90–91.

B.    *Davis's Testimony*

At the first administrative hearing on June 6, 2012, Davis testified that he had tried to enroll in community college, but he "didn't have the money for . . . the school." R. 32. He said was "trying to enroll in National College this year" and still "want[ed] to do electronics." *Id.* Davis knew how to write and used the computer to "search up things sometimes . . . and [for] emailing and stuff like that." R. 36, 37. He had completed special-education English courses for "reading [because] some things [he] can't like comprehend." *Id.* He also twice failed the drivers' license test because he "couldn't really comprehend with it." *Id.*

At the second administrative hearing on July 15, 2015, Davis testified that he had worked from July to November 2014 unloading boxes from a truck, but that he was not able to do the lifting. R. 386–88. His employer then put him at a desk job, but Davis could not understand the

work. R. 388–89. At the time of the hearing, Davis was trying to take online college courses because he wanted to be "an electrician or something like that." R. 390. In March 2015, Davis broke his femur in a car accident. *Id.* Before the accident he drove about three times a week, going to the grocery store or taking his mother to the doctor. R. 390–91. Davis regularly hung out with friends; played football, basketball, and video games; helped his mother work in her flowerbed; cut the grass with a riding mower; and cooked meals in a microwave. R. 390–92, 395. He helped his niece, who was eight years younger than him, with her homework. R. 395. ALJ Munday asked Davis whether he required "less and less intensive, frequent and individualized instruction" as he progressed to the twelfth grade, and Davis replied, "No ma'am." R. 396.

## C.    *Analysis*

Davis argues that ALJ Munday's RFC determination did not account for all of his mental limitations. A person's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in her RFC finding, *id.* at 636, and explaining why she discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). In discharging her duty to provide an assessment of a claimant's "work-related abilities on a function-by-

function basis," the ALJ must make specific findings about the impact of a claimant's impairments and credible, related symptoms on his ability to work. *Mascio*, 780 F.3d at 636; *accord Monroe v. Colvin*, 826 F.3d 176, 187–88 (4th Cir. 2016).

Assessing Davis's RFC, ALJ Munday thoroughly discussed the medical and other evidence and found that his intellectual difficulties were not disabling. R. 486. She noted that Davis's full scale IQ fell in the borderline range and that he was enrolled in special education, although his needs were mild enough that he could receive direct instruction and consultative services in a regular classroom. R. 486, 489. Davis did not demonstrate significant cognitive disabilities that required intensive, frequent, and individualized instruction in a more restrictive setting. R. 488. Reminders helped him to stay on task and to progress. *Id.* He passed all of his classes in twelfth grade, had a great year, and graduated from high school with a modified diploma. R. 486, 488. He had not sought treatment for intellectual impairment or vocational training. *Id.* Davis got along well with adults and his peers. R. 488. As for his activities, Davis played games and basketball, went to sporting events with friends, obtained a driver's license and drove, shopped alone, used the microwave, helped his niece with her homework, used the computer, and performed chores such as mowing the lawn and vacuuming. R. 486–87, 489. Additionally, he intended to take college classes "and the only reason he did not start, was his mother's failing health." R. 486–87; *accord* R. 489. She found that these activities were inconsistent with someone who had disabling intellectual functioning. R. 489, 493. Considering this evidence relevant to his mental RFC, ALJ Munday determined that Davis could perform simple, routine tasks involving simple work-related decisions, few workplace changes, and no work at a fixed production rate pace. R. 491.

In making her RFC determination, ALJ Munday also considered and weighed the medical opinions[5] from Drs. Cousins and Montgomery. She found that the above analysis supported her decision to credit both doctors' opinions that Davis would have moderate difficulties completing a normal workday or workweek without interruption from psychological symptoms and in performing work activities on a consistent basis as well as her decision to disregard their opinions that Davis had a moderate limitation in sustaining ordinary activities without special instructions or additional assistance. R. 492.

As to Davis's difficulty completing a workday or workweek, ALJ Munday limited the pace of his work and the changes in his work routine. She also accounted for his intellectual impairment by limiting him to simple, routine work that would not require him to make decisions. These limitations are reasonably calculated to address Davis's borderline intellectual functioning and to minimize interruptions from related symptoms that Davis experiences. As such, ALJ Munday provided a logical bridge between the limitations caused by Davis's mental impairment and her assessment of his functional abilities. Accordingly, I find that substantial evidence supports this part of her RFC determination.

Turning to Davis's need for special instructions and additional supervision, ALJ Munday found that his activities showed he did not need this accommodation. I disagree. The evidence shows Davis was fairly active, but many of the cited activities—playing video games, exercising, helping his mother do yard work, and doing various activities with his friends—say little about Davis's ability to sustain work for an eight-hour workday without special instructions or additional supervision, although his ability to drive and shop alone provide some support for ALJ

---

[5] "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

Munday's conclusion. She also cited Davis's intent to attend college. In his IEP review prior to graduating, Davis indicated that he planned to attend community college and transfer to Virginia Commonwealth University. R. 252. He expressed similar intentions at various times over the next seven years and even at the administrative hearing. At the time of ALJ Munday's decision, Davis's idea of taking college classes has not been fulfilled or even begun. Perhaps this goal shows Davis's estimation of his abilities, but an unfulfilled intention to take college classes does not support the ALJ's finding that Davis can perform work functions without additional assistance. Indeed, a reasonable inference to be drawn from his inability to enroll in classes, despite planning to do so for seven years, is that Davis requires some assistance in completing tasks.[6] Moreover, this inference is supported by Davis's school records.

ALJ Munday interpreted Davis's school records as showing that he progressed in twelfth grade to the point that he needed "less and less, intensive, frequent and individualized instruction." R. 396. Davis denied this was the case. *Id.* She further noted that his needs were "mild enough" that he could receive services in the regular classroom. R. 492. ALJ Munday's discussion of these records is accurate, but the inferences she drew from them are flawed. Davis's school records show that he was able to graduate with a modified diploma only after receiving accommodations, including ninety minutes a day of direct special education support from his case manager and consistent reminders and encouragement from his teachers to stay on track. ALJ Munday noted that he received these services in a regular classroom, but this evidence does not, as ALJ Munday found, show that Davis had no need for similar assistance in a work setting. Instead, the logical conclusion is that he could function in a regular work setting, but, as in a regular school classroom, Davis would need some additional accommodation or

---

[6] ALJ Munday identified Davis's mother's poor health as the "sole" reason he did not enroll in classes. I found no mention of that reason in the record. *See, e.g.,* R. 32 (Davis's testimony at first hearing), 342 (Davis's statement to Dr. Cousins), 390 (Davis's testimony at second hearing).

assistance. Nonetheless, that is exactly the functional limitation that ALJ Munday determined Davis did not need.

ALJ Munday also faults Davis for not seeking out treatment for his intellectual disabilities or vocational training. R. 486, 488. She did not elaborate on what sort of treatment she thought would help Davis with his borderline intellectual functioning, and neither Dr. Cousins nor Dr. Montgomery suggested or even mentioned that treatment was an option. At the hearing, ALJ Munday asked Davis whether he had pursued vocational training (he had not). Nothing in the record, however, explains how vocational training could have affected Davis's need for additional supervision in the workplace.

Ultimately, the fact that Davis could perform a few activities by himself does not outweigh the evidence from his school records, his doctors' opinions, and his own testimony showing that he would require additional supervision or special instruction.[7] Thus, ALJ Munday's RFC determination that Davis would not need special instruction or additional supervision is not supported by substantial evidence. Without a proper RFC or hypothetical posed to a VE, the Court cannot determine whether substantial evidence supports ALJ Munday's determination that Davis can perform other work in the national economy. Accordingly, the case must be remanded. On remand, the ALJ shall include in Davis's RFC a restriction reflecting his

---

[7] Davis also argues that ALJ Munday was bound by the "law of the case doctrine" to adopt ALJ Swank's finding that Dr. Cousins's opinion was due great weight. Pl. Br. 5. "The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings." *Brachtel v. Apfel*, 132 F.3d 417, 420 (8th Cir. 1997) (quoting *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995)). In the previous Report and Recommendation, I did not find that the ALJ must give any particular weight to Dr. Cousins's opinion. Rather, I found "that the RFC limiting Davis to 'simple and unskilled' work, without incorporating the specific mental limitations identified by the ALJ, Dr. Cousins, and Dr. Montgomery, or explaining why those limitations do not apply, is not supported by substantial evidence in the record." Report and Recommendation at 22. I recommended remand because ALJ Swank's finding that "Davis can perform 'simple and unskilled work' does not adequately reflect his own findings and other credited evidence about the effects of Davis's mental impairment and the limitations they impose on his ability to perform basic work-related tasks on a sustained basis." *Id.* at 25–26. Neither conclusion compelled ALJ Munday to afford great weight to Dr. Cousins's opinion.

moderately limited ability to sustain an ordinary routine without additional supervision or special instructions, and any hypothetical presented to a VE also must include this restriction.

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence does not support the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** Davis's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, **REMAND** this case for further administrative proceedings, and **DISMISS** the case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 22, 2017

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge